Robert S. Clark (4015)
PARR BROWN GEE & LOVELESS, PC
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
*rclark@parrbrown.com*

Daniel Wolff (Pro Hac Vice Pending)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
*dwolff@crowell.com*

Henry W. Leung (Pro Hac Vice Pending)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
*hleung@crowell.com*

*Attorneys for Plaintiff SkyWest Charter, LLC*

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN REGION OF THE CENTRAL DIVISION - DISTRICT OF UTAH

| | |
|---|---|
| SKYWEST CHARTER, LLC <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF TRANSPORTATION, <br><br> Defendant. | **COMPLAINT** <br><br> Civil No. 4:24-cv-36 <br><br> Judge _____ |

Plaintiff SkyWest Charter, LLC ("SWC") brings this Complaint under the Administrative

Procedure Act ("APA") and the Mandamus Act against defendant U.S. Department of

Transportation ("DOT") for the causes of action alleged as follows:

## INTRODUCTION

1.      SWC is an air carrier. In DOT regulatory speak, it is a specific type of air carrier: a DOT Part 298 registered *air taxi operator*. In June 2022, SWC filed an application with DOT's Office of the Secretary ("OST") for economic authorization to operate as a Part 298 *commuter air carrier*. That application was docketed at DOT[1] on June 21, 2022. SWC proposed in its application to initiate service as a commuter air carrier in October of the same year. More specifically, it proposed to provide service to smaller communities, including some that are covered by Essential Air Service, or EAS, a statutory program managed by DOT to guarantee a minimal level of air service to eligible small communities that received air service prior to the Airline Deregulation Act of 1978.

2.      In the nearly two years DOT has had to decide SWC's application, it has failed to do so. By this lawsuit, SWC seeks the Court's assistance to compel DOT to act.

3.      Through its application, SWC seeks DOT commuter air carrier authority so that SWC may help fill the need of small communities throughout the country for safe, efficient, and reliable air service that is not currently being met. Hundreds of communities desire air service that is not provided by larger airlines, and as a practical matter is only ever provided through the type of service SWC proposes to provide—but SWC can only do so with authorization by DOT. SWC satisfies all conditions needed for regulatory approval. For its safety programs and operational plans, SWC is using the same programs and plans that have long been used by its affiliate, SkyWest Airlines, which

---

[1] Unless specified otherwise, references to any action or inaction of "DOT" should be interpreted to include action or inaction of "OST" and any responsible agency officials.

DCACTIVE-76208604.1

has an outstanding safety and operational record. SWC is ready to implement operations to these communities—communities that want SWC's air services.

4.      DOT's delay is arbitrary. Prior applications of this sort are decided by DOT in a matter of months, not years. Over a year and a half ago, DOT staff informed SWC that the agency had all the information it needed and that a draft decision was being circulated within DOT. Yet, a year and a half later, DOT refuses to either approve or deny the application.

5.      There is no basis for DOT's refusal to act. SWC's application provides extensive company information and service data to support a determination by DOT that SWC is fit, willing, and able to operate as a commuter air carrier as proposed. SWC promptly responded to DOT's only request for additional information—in September 2022—and was told by DOT that not only was the record on its application complete, but that a draft decisional order was being circulated for approval in late 2022. DOT's delay is demonstrably unreasonable and arbitrary under usual principles of administrative law, and is especially unjustified when compared to the average decisional timeframe of similar applications filed with DOT in recent years.

6.      As of the filing of this Complaint, DOT purports to be still reviewing SWC's application.

7.      DOT also purports to be reviewing certain third-party filings in the public docket that nominally raise objections to SWC's application. But, as explained below, those third-party filings are a red herring: none of those filings challenges or even addresses SWC's fitness to be a commuter air carrier, which is the only determination DOT is being asked to make regarding SWC's application.

8.      Rather, those third-party filings challenge the propriety of a decades-old regulatory

3

scheme administered by a different DOT agency with a different regulatory mandate: the Federal

Aviation Administration ("FAA"). In other words, those filings raise issues that are not for *DOT* to

decide, let alone decide in the context of SWC's application to operate as a commuter air carrier. At

most, DOT should have referred all such comments to FAA, or directed the third parties to petition

FAA separately for a rulemaking. In all events, DOT should have severed those comments from

consideration as part of SWC's application docket.

9.      Whatever the merit to the opposing views concerning the *FAA* regulatory scheme

toward which those comments are directed, SWC's application to operate as a commuter air carrier

under *DOT* authority is not a proper forum to adjudicate them.

10.     Moreover, in August 2023—undoubtedly in response to the comments filed in the

SWC application docket—FAA issued a Notice of Intent to Institute Rulemaking that creates a forum

for those concerns: FAA created a specific rulemaking docket to address those exact issues. That is

the proper forum for the opposing viewpoints to be considered and acted upon, by FAA, concerning

FAA regulations that do not bear on SWC's application to DOT.

11.     DOT has allowed SWC's application to be hijacked by a third-party collateral attack

on a distinct regulatory scheme managed by FAA that should have no bearing on DOT's

consideration of SWC's application. While that is reason enough to find DOT's delay in acting on

SWC's application unreasonable and arbitrary under basic principles of administrative law, the real-

world impacts to the small communities—including EAS-eligible communities—that SWC seeks to

serve are just as substantial. DOT's delay means those communities are not getting the level, volume,

and quality of airline service that they want and need, and that DOT in many cases is obligated by

statute to ensure is provided. Nor is SWC, until licensed as a commuter air carrier, permitted by DOT

DCACTIVE-76208604.1

to compete for EAS contracts, to the detriment of the traveling public.

12.     DOT's failure to act on SWC's application has prevented SWC from providing even adequate air services to smaller communities, much less the level of air services these communities desire and that SWC has proposed, superior to what they are currently receiving. Therefore, SWC is left with no choice but to file this lawsuit seeking an order from the Court compelling DOT to so act.

13.     The request here is a limited one: SWC does not ask this Court to dictate the outcome of DOT's review; it seeks only an order requiring DOT to take action on SWC's application as required by law by deciding, yes or no, whether SWC should receive the commuter air carrier authority for which it applied nearly two years ago.

## PARTIES

14.     Plaintiff SWC is a limited liability company organized under the laws of Utah with its headquarters at 444 South River Road, St. George, Utah 84790. It is a wholly owned indirect subsidiary of SkyWest, Inc., which is also the parent company of SkyWest Airlines, Inc., the world's largest regional airline.

15.     Defendant DOT is an Executive Branch agency created by the Department of Transportation Act of 1966, Pub. L. No. 89-670, 80 Stat. 931. It was created to, among other things, "facilitate the development and improvement of coordinated transportation service, to be provided by private enterprise to the maximum extent feasible." *Id*. § 2(b)(1). Many of DOT's authorities, including those that govern SWC's application, were inherited decades ago from its predecessor agency, the now-defunct Civil Aeronautics Board. DOT is headquartered in Washington, D.C.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this

DCACTIVE-76208604.1

case arises under the APA, 5 U.S.C. §§ 701-706.

17.     This case is reviewable under 5 U.S.C. § 706(1), which authorizes this Court to compel "agency action unlawfully withheld or unreasonably delayed."

18.     This Court also has jurisdiction and authority to compel the DOT to act under the Mandamus Act, 28 U.S.C. § 1361, and the All Writs Act, 28 U.S.C. § 1651.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1).

## LEGAL FRAMEWORK

### I.     DOT and FAA Authority Required to Operate Common Carriage by Air

20.     Air carriers in the United States are highly regulated, predominantly by agencies within DOT, namely OST and FAA. In general terms, OST is responsible for economic regulation which includes assuring the fitness of U.S. airlines, while FAA is responsible for overseeing the safety of civil aviation.

21.     Aircraft operators that carry passengers or property for compensation of hire in common carriage (*i.e.*, airlines) need to separately obtain DOT *economic* authority and FAA *safety* authority.

22.     The regulations relevant to this lawsuit are found in Title 14 of the Code of Federal Regulations. The relevant DOT (OST) regulations are found in Parts 204, 298 and 380 of that title. The relevant FAA regulations are found in Parts 110, 119, 121 and 135 of that title. These regulations distinguish between the responsibilities of DOT, which is charged to rule on the merits of SWC's application, and the responsibilities of FAA. The opponents of SWC's application raise objections pertinent to FAA's regulations, but which are immaterial to the application.

23.     Part 298 of the DOT (OST) Economic Regulations underlies the application SWC submitted for commuter air carrier authority on which DOT has failed to act. The FAA regulations

6

at which the parties opposing SWC's application take aim classify the type of operations SWC could conduct under its FAA air carrier certificate and, therefore, the FAA rules with which it would be required to comply when operating under the DOT authority for which SWC applied. SWC already has an FAA air carrier certificate. Understanding the interplay of those regulations with DOT's regulations elucidates why the objections raised to SWC's application, and DOT's delay in granting SWC's application, are baseless.

### A.   DOT (OST) Economic Authority Under Part 298

24.     There are three primary types of DOT economic authority for direct air carriers: a certificate of public convenience and necessity; a commuter air carrier authorization; and an air taxi registration.

25.     *DOT Certificate.* Generally, for an aircraft operator to carry passengers or property for compensation or hire in common carriage, that operator must obtain from DOT a certificate of public convenience and necessity under 49 U.S.C. § 41101 ("DOT Certificate"). However, a blanket exemption is available for the operation of "small aircraft," *i.e.*, airplanes originally designed for 60 or fewer passenger seats, *see* 14 C.F.R. § 298.2 (defining "large aircraft" as those originally designed for more than 60 passenger seats, among other indicia); *see also* 49 U.S.C. § 40109(f) (DOT authority to exempt). Under Part 298 of OST's regulations, two types of common carriers can operate small aircraft under OST's economic authority without obtaining a DOT Certificate: (i) commuter air carriers; and (ii) air taxi operators.

26.     *Part 298 Commuter Air Carriers.* Commuter air carriers carry passengers on at least five round trips per week on at least one route between two or more points pursuant to a published flight schedule. *See* 14 C.F.R. §298.3(b). To obtain economic authority as a commuter air carrier, the operator must file an application with OST containing a wide range of information as set out

7

primarily in 14 C.F.R. § 204.3. The Air Carrier Fitness Division of OST's Office of Aviation Analysis analyzes and evaluates such an application to determine whether the applicant (1) is a citizen of the United States (as defined in 49 U.S.C. § 40102(a)(15)) and (2) is *fit, willing, and able* to provide the service it proposes.

27.     DOT's fitness review is nothing new: the regulatory scheme was transferred to DOT from the Civil Aeronautics Board, an agency created in the 1930s but which Congress phased out of existence as of January 1, 1985, under the Airline Deregulation Act of 1978.

28.     The fitness review for such an application consists of three elements: (1) managerial competence, (2) compliance disposition, and (3) financial fitness.[2] The contents of this application as well as the fitness standards to be satisfied are identical to those applied to major airlines and other applicants for a DOT Certificate.

29.     *Part 298 Air Taxi Operators.* Air taxi operators are carriers that operate less than five round trips per week between two or more points pursuant to a published flight schedule or that have no regular schedule at all. 14 C.F.R. § 298.3(a). To obtain economic authority as an air taxi operator, the operator must file a DOT Air Taxi Registration form and certain ancillary forms, but is not evaluated for fitness (*i.e.*, no additional application is necessary).

**B.     FAA Safety Authority Under Parts 119, 121 and 135**

30.     As noted above, in addition to obtaining DOT economic authority, an aircraft operator must separately obtain FAA safety authority. In the case of U.S. operators carrying persons or property for hire, this safety authority takes the form of a Part 119 FAA Air Carrier Certificate

_____

[2] *See Information Packet: How to Become a Commuter Air Carrier*, Department of Transportation, Office of the Secretary, Air Carrier Fitness Division, page 8 (Sep. 2012), https://www.transportation.gov/sites/dot.gov/files/docs/Commuter_Packet_2012_Final.pdf.

DCACTIVE-76208604.1

together with FAA Operations Specifications that specify the rules applicable to that air carrier's operations, including whether the carrier is required to operate under Part 121 or Part 135.

31.     *Part 121 Scheduled Operations.* Air carriers that operate under a Part 121 certificate are generally large, U.S.-based airlines, such as United Airlines, American Airlines, and Delta Air Lines. Such carriers operate regularly scheduled domestic and international air transportation.

32.     *Part 135 Commuter and On-Demand Operations.* Part 135 carriers, on the other hand, do not engage in "scheduled operations" as that term is defined by FAA. They can range from small single-engine aircraft operators, to operators of large fleets of non-jet aircraft with nine or fewer passenger seats, to operators with large fleets of business jet aircraft (*e.g.*, Learjets and Gulfstreams, which typically have 6-19 passenger seats), to operators of regional jet aircraft configured for up to 30 passengers. Operations Specifications issued by FAA that relate to Part 135 are one of two types: (i) commuter or (ii) on-demand.

33.     Although the term "commuter" is used in both the DOT and FAA regulations, its meaning is materially different as applied by DOT and FAA. Relevant here, an operator that receives a Part 298 commuter air carrier authorization from DOT does not necessarily qualify as an FAA Part 135 commuter operator. Among other reasons, this is because of different passenger seating limitations under the respective regulations. DOT and FAA also evaluate an aircraft's seating *capacity* differently. *Compare* 14 C.F.R. § 298.2 (DOT defining "large" aircraft based on *original design* of seating capacity), *with* 14 C.F.R. § 119.3 (FAA determining on-demand operations based on *actual configuration* of seating capacity).

34.     Under FAA regulations, Part 135 "commuter" operations refer to "scheduled operation[s]" with a frequency of five or more round trips per week on aircraft that are not jet-

9

powered and have a maximum seat configuration of nine passenger seats. This classification is not relevant for purposes of this lawsuit.

35.     What is relevant to this lawsuit are the FAA Part 135 regulations for "on-demand" operations, which refer to operations with jet-powered aircraft with 30 or fewer passenger seats.[3] An on-demand operator must be one that *either* (a) specifically negotiates departure or arrival times and locations with the customer, *or* (b) conducts its passenger-carrying operations as a Part 380 public charter. *See* 14 C.F.R. § 110.2.

### C.     Part 380 Public Charters

36.     In accord with governing regulations and decades of consistent DOT and FAA practice, SWC proposed in its DOT commuter air carrier fitness application to operate regional Part 380 public charter service.

37.     The Part 380 public charters to which FAA refers in its definition of "on-demand" operations are authorized under DOT's Special Regulations. Part 380 authorizes "public charter operators" (which are indirect air carriers) to hold out and sell seats on flights that are operated by a direct air carrier with which the charter operator has contracted.[4] Like air taxi and commuter air carrier status, public charter operator status under Part 380 represents a blanket DOT exemption to the requirement that any person that offers air transportation to the public as a principal or operates flights in air transportation must hold a DOT Certificate. A public charter exists when contracted charter flights to and from a destination are advertised and sold to members of the public. Both the

---

[3] Non-jet aircraft with 30 or fewer passenger seats are also eligible for and used in Part 135 on-demand operations, although such operations are not relevant to this lawsuit.

[4] A "direct air carrier" is an aircraft operator and thus engages *directly* in the provision of air transportation. An "indirect air carrier" does not operate aircraft, instead hiring a direct air carrier to do so on its behalf. Both are common carriers.

10

public charter operator and the direct air carrier must comply with a detailed set of DOT consumer protection regulations in Part 380, including the requirement that all of the public charter flights being offered be set forth in a jointly signed prospectus accepted by DOT. *See* 14 C.F.R. § 380.25.

38.     As with the regulations governing its carrier fitness reviews, DOT's Part 380 regulations date back to its predecessor agency, the Civil Aeronautics Board. As originally conceived, public charters were typically vacation packages including flights and hotels. Over time, the concept evolved and many public charter operators offered flights targeting business travelers. Thus, "charter" operations are neither exclusively targeted to nor synonymous with vacation travel and, indeed, tens of thousands of DOT-accepted Part 380 public charter flights operate every year in non-vacation travel markets as diverse as Dallas-Houston and Macon (Georgia)-Baltimore.

39.     A DOT Part 380 public charter is specifically excluded by FAA from the definition of "scheduled operation" and specifically included in the definition of "on-demand operation." 14 C.F.R. § 110.2. Based on this longstanding authority, tens of thousands of public charter flights—on jet aircraft with 30 or fewer passenger seats flying on regular schedules—operate, for FAA-authorization purposes, as Part 135 on-demand operations. As discussed above, these flights are offered with departure and arrival points and flight schedules that are held out to the public. If not for the specific exception that FAA makes for DOT Part 380 operations, these flights would be classified as scheduled operations and, subject to the type and size of aircraft being flown, would have to be operated under FAA Part 121. FAA has issued legal guidance confirming that Part 380 public charter service with aircraft configured for up to 30 passenger seats is properly classified as on-demand.[5]

---

[5] This exclusion from Part 121 has existed since the original rule was adopted in 1995, *see* 60 Fed.

40.     Given this regulatory background, a carrier operating aircraft with 30 or fewer passenger seats is authorized to fly passengers on behalf of an indirect carrier (the charter operator): the direct carrier has Economic Authority from DOT under Part 298 and, because the flights are public charter flights under Part 380 and thus deemed on-demand for FAA purposes, the carrier's Safety Authority from FAA provides for the flights to be operated under Part 135.

## II.     DOT's Regulatory Obligation to Act on a Commuter Air Carrier Application

41.     As explained above, an application for commuter air carrier authorization is an application for DOT (OST) Economic Authority. *See* 14 C.F.R. §§ 298.50 (application for commuter air carrier authorization), 201.1 (formal requirements for same), 204.3 (data to support fitness determination).

42.     An application is placed in a public docket and subject to public notice and comment. Once an application is filed, any person may file in the public docket an "answer" in support of or in opposition to an application for commuter air carrier authorization, and the applicant may reply. Any additional *ex parte* written communications—such as letters sent to DOT or OST officials concerning an application—must be placed in the public docket for that application.

43.     The Assistant Secretary for Aviation and International Affairs is the "DOT decisionmaker" and official authorized to issue a final decision on such an application. In this instance, that official is Assistant Secretary Carol A. (Annie) Petsonk.

44.     The regulations require the DOT decisionmaker to take one of the following actions

---

Reg. 65832, 65916 (Dec. 20, 1995), and was made even more explicit by citation to Part 380 when the rule was amended in 1997. *See* 62 Fed. Reg. 5076-77 (Feb. 3, 1997). When FAA issued the final rule, it adopted the definitions discussed above as proposed and noted that there were no comments filed with respect to those provisions. 62 Fed. Reg. 13248 (Mar. 19, 1997).

on an application: (1) issue an order to show cause; (2) issue a final order granting the application if "there are no *material* issues of fact that warrant further procedures for their resolution"; (3) issue a final order dismissing the application; (4) issue an order setting the application for oral evidentiary hearing; or (5) begin to make a determination "under simplified procedures without oral evidentiary hearing." 14 C.F.R. § 302.210(a) (emphasis added); *see id*. § 298.51 (directing DOT to "generally follow" 14 C.F.R. §§ 302.207 - 302.211 in processing commuter air carrier applications).

45.    The regulations also allow "the DOT decisionmaker [to] defer further processing of the application until all of the information necessary to process that application is submitted," so long as the decisionmaker decides to do so within 28 days after the filing of the application. 14 C.F.R. § 302.209.

## PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

**I.    SWC Submitted a Commuter Air Carrier Application to DOT.**

46.    SWC currently holds a Part 119 FAA Air Carrier Certificate with Operations Specifications for Part 135 on-demand operations, as explained above.

47.    SWC currently has DOT authorization as a Part 298 air taxi operator, as explained above.

48.    SWC submitted an application to DOT to operate as a Part 298 commuter air carrier, as explained above. That application was officially docketed by DOT on June 21, 2022.[6]

49.    SWC's service proposal focused on service to underserved communities/markets, including some covered by DOT's EAS program, which exists to ensure service to smaller

---

[6] *See* SkyWest Charters LLC - Commuter Air Carrier Authorization, Docket DOT-OST-2022-0071, https://www.regulations.gov/search?filter=DOT-OST-2022-0071.

communities that were receiving scheduled airline service prior to the Airline Deregulation Act of 1978. *See generally* 14 C.F.R. Part 325; 49 U.S.C. § 41732(a). SWC's service proposal anticipated inaugurating commuter air carrier service in October 2022.

50.     SWC's service proposal also explained that it would operate Part 380 public charter flights as the direct air carrier. SWC proposed to operate service with 30-seat aircraft leased from its affiliate, SkyWest Leasing, Inc.—aircraft which have already been flown in the same and similar markets for many years by SWC's affiliate, SkyWest Airlines.[7]

51.     As explained above, SWC's proposal to operate as a commuter air carrier is required to be evaluated by DOT under Parts 204, 298 and 302 on the three elements of managerial competence, compliance disposition, and financial fitness.

52.     In support of its application, SWC submitted over 400 pages of materials demonstrating its fitness pursuant to these three elements.

53.     In its application, SWC showed that it is a U.S. citizen, as required. SWC also noted that, because it had recently been purchased by SW Charter Holdings, Inc., a direct subsidiary of SkyWest, Inc., it was in the process of being domesticated (from New Jersey) as a Utah LLC.

54.     SWC requested that DOT process its application expeditiously because: (1) the application provided clear evidence of SWC's fitness; (2) the application presented no issues of material fact; and (3) expedited treatment would directly serve the public interest by enabling SWC to ensure continuity of service to underserved markets.

---

[7] SkyWest Leasing, Inc., is also wholly owned by SkyWest, Inc.

DCACTIVE-76208604.1

II.     **Despite Overwhelming Support for SWC's Commuter Fitness Application, ALPA Opposed SWC's Application Without Actually Challenging SWC's Fitness.**

55.     SWC's application and its proposal to provide air service to small communities enjoyed overwhelming support, as demonstrated by more than 70 letters of support posted to SWC's application docket. Those letters of support were written and signed on behalf of regional airports, cities, visitors' bureaus, local business associations, chambers of commerce, and city public schools. The letters of support comprise the majority of documents on file in the application docket.

56.     Notwithstanding this broad support, opponents of the existing FAA regulatory scheme commandeered the SWC application docket to vent their frustrations, sow confusion in the approval process, and cause delay. The strategy worked.

57.     In particular, on July 8, 2022, the Air Line Pilots Association, International ("ALPA") filed an answer opposing SWC's application.

58.     ALPA's opposition rested on the notion that SWC was trying to game the system by reconfiguring aircraft previously flown by SkyWest Airlines to allow it to fly the same routes as charter flights, with FAA Part 135 authority, in contrast to SkyWest Airlines' FAA Part 121 authority. ALPA complained that SWC's "proposal is a subterfuge to avoid the safety-critical First Officer Qualification [] rules as Congress authorized in the Airline Safety and FAA Extension Act of 2010, which regional airlines like [SWC] are seeking to weaken." As ALPA described it, SWC was merely an "alter-ego" of SkyWest Airlines, avoiding the obligation to obtain FAA Part 121 authority by removing 20 seats from same planes SkyWest Airlines had flown so it could, under FAA regulations, reclassify them for Part 135 on-demand service using the Part 380 public charter exception.

59.     This mattered, ALPA complained, because FAA Part 135 authority does not demand

the same level of pilot experience and qualifications required of the captain and first officer on the flight deck on aircraft flown under FAA Part 121 authority. ALPA decried the SWC application as taking advantage of a "loophole" in the FAA regulatory scheme.

60.     ALPA's characterization of the respective FAA authorities is inaccurate. More importantly for SWC's application, and relevant to this Complaint, however, is that ALPA's dissatisfaction with the FAA regulatory scheme has nothing to do with the DOT Economic Authority for which SWC applied. Specifically, SWC's *fitness* to operate as a commuter air carrier is determined based on DOT regulations and the criteria described above. The appropriate FAA authority is determined separately by FAA, to which DOT defers on matters relating to classification of operations and the FAA regulations that apply, and which does not bear on DOT's commuter air carrier approval process under Part 298.

61.     Curiously, it appears ALPA has never objected to an application for commuter air carrier authority prior to SWC's—nor has it objected to either of the commuter applications filed subsequent to SWC's.[8]

62.     On July 20, 2022, SWC replied to ALPA's answer, highlighting that ALPA had not addressed SWC's fitness or qualifications—the only criteria relevant to its application. SWC pointed out that the so-called "loophole" decried by ALPA was authorized by the original 1995 FAA regulations and expressly affirmed by the 1997 amendments to the same, to which ALPA never objected at the time. Moreover, SWC noted, multiple DOT orders authorizing service similar to that

---

[8] *See* True Aviation Charter Services LLC - Commuter Air Carrier Authorization, Docket DOT-OST-2022-0116 (Oct. 12, 2022), https://www.regulations.gov/search?filter=DOT-OST-2022-0116; USAC Airways 695 LLC d/b/a Aero Air - Commuter Air Carrier Authorization, Docket DOT-OST-2022-0139 (Nov. 29, 2022), https://www.regulations.gov/search?filter=DOT-OST-2022-0139.

proposed by SWC demonstrated precedent confirming the legality of the structure. Additionally, the regulatory requirements for seating capacity do not support ALPA's contention that SWC was simply stripping SkyWest Airlines' planes of 20 seats to qualify; and SWC was not acting as an alter ego or surrogate, but was and is a separate entity benefitting from its corporate affiliates' operational expertise and market history.

### III. By September 1, 2022, DOT Completed a Draft Decisional Order To Be Circulated Internally After Receiving Additional Information, But Never Issued a Decision.

63.     Beginning in August 2022, SWC reached out to DOT multiple times for updates on its application and was told repeatedly to expect a decisional order soon, with anticipated dates identified. SWC kept waiting for months and months; the DOT's decision never came.

64.     On August 11, 2022, after sending multiple emails asking for a status update on its application, SWC received a response from Damon Walker, Lead Transportation Industry Analyst in OST's Air Carrier Fitness Division. Walker explained, "The case is contested so our conversations are pretty much limited to status updates. We are still reviewing the application, answers, and replies. I should know by COB tomorrow if we need any additional information or if we will proceed with drafting a decisional order. I would not expect an [sic] decisional order until the end of the month."

65.     On September 1, 2022, Walker informed SWC by email that "[w]e have completed a draft decisional order" and "[w]e should be ready to circulate a decisional order for further review once you have responded to" what was a request for additional information attached to the email.

66.     The letter attached to Walker's email noted that "[w]e have completed our initial review" of SWC's application, but also requested (1) evidence that SWC had redomiciled in Utah along with a certificate of good standing; and (2) clarifications about the duties and responsibilities of SWC's Director of Operations, Director of Maintenance, Chief Pilot, and Senior Manager of

Safety Assurance. DOT requested a full response within 30 days.

67.     Of note, nothing in DOT's correspondence or request for additional information gave any hint of potential issues with SWC's fitness for commuter air carrier authorization.

68.     Six days later, on September 7, SWC provided the supplemental information as requested. DOT made no further information requests. By no later than that point, therefore, DOT had all the information it needed to act on SWC's application.

69.     On October 21, 2022, after further inquiries from SWC as to the status of its application, Walker told SWC: "We are still coordinating a decision on the application. We still have several offices left in the coordination process prior to any decisional order being issued. Based on a current estimate of remaining coordination activities and scheduled meetings, I would not expect any decisional order before early to mid-November. The review of the application has taken longer than I initially anticipated with multiple offices involved and requiring extensive interagency coordination."

70.     On December 2, 2022, after further inquiries from SWC, Walker confirmed that SWC's response to the September request for information was sufficient and all that was left was for DOT to issue its decision: "[W]e believe the record is complete and we are coordinating action among various Department offices." He noted that DOT was "aware of the applicant's eagerness for Department action and [we] are working expeditiously to reach a decision on the application."

71.     Walker noted, however, that "the record in this case is quite extensive with more than 25 years of rulemaking and statutory actions cited," seemingly alluding to ALPA's collateral attack on FAA's regulatory scheme—a regulatory scheme dating back to 1995—but not to anything that called into question the fitness of SWC to operate as a commuter air carrier under DOT authority.

DCACTIVE-76208604.1

IV.    **The DOT Application Docket Was Hijacked by a Rulemaking Letter Campaign Unrelated to SWC's Fitness to Operate.**

72.    Meanwhile, long after the answer period for SWC's commuter application had closed, the application docket was hijacked by the posting of *ex parte* letters sent by third parties to the offices of DOT, OST, FAA, and related agencies. These letters opposed SWC's application but, like ALPA's earlier answer, said nothing about SWC's fitness and were instead directed at the FAA regulatory scheme to which ALPA had already objected.

73.    On December 2, 2022, the same day Walker informed SWC that its application file was complete and DOT was working expeditiously on a decision, a coalition of four pilot unions (not ALPA) wrote a letter to DOT Secretary Pete Buttigieg and Acting FAA Administrator Billy Nolen asking that SWC's application be denied because it was "a flagrant attempt by a Part 121 passenger airline to evade [FAA] Part 121 safety requirements . . . by exploiting a 'public charter' loophole to fly a published schedule with 30-seat turbojet aircraft under Part 135." This letter, along with subsequent letters discussed below, was posted to SWC's application docket.

74.    At that point, the application docket went cold for four months, until April 26, 2023, when ALPA submitted a similar letter to Secretary Buttigieg, reprising the same issues it had raised in its July 8, 2022, answer to SWC's application.

75.    The next day, SWC responded with a letter addressing, among other things, the safety concerns raised by ALPA as a result of the so-called regulatory loophole. For the avoidance of doubt, and although the concerns expressed by ALPA and others with the applicable FAA safety standards had no bearing on DOT's fitness criteria by which SWC's application was to be adjudicated, SWC emphasized that its own safety programs *exceed* Part 135 requirements. This is because SWC adheres to the same safety programs of SkyWest Airlines, its affiliate operating under FAA Part 121.

DCACTIVE-76208604.1

76.     Following these letters came a flurry of similar filings by other parties. For example, on May 5, 2023, a larger coalition of unions (including ALPA, three of the unions that sent the December 2 letter, and others) sent a letter to secretaries and administrators for various agencies (including DOT and FAA) addressing the "loophole created by [the] combination of rules" in the regulatory scheme. The letter alleged that a different air carrier, JSX, had already taken advantage of this loophole to evade regulatory standards, and inspired others—including SWC—to follow suit.

77.     This in turn triggered a series of letters that did not even purport to concern SWC or its application, let alone raise issues material to that application, but that instead were de facto requests for an agency rulemaking to clarify or amend the FAA regulatory scheme.

78.     For example, on May 16, 2023, American Airlines wrote a letter "urg[ing] the [DOT] to provide regulatory clarity on the use of 14 CFR part 380 public charter regulations to provide a facsimile of common carriage scheduled service through 14 CFR part 135 charter operations," in part because of the pilot unions' characterization of the JSX model. The letter was posted to the SWC application docket yet made no mention of SWC whatsoever.

79.     Conversely, JetBlue Airways sent a letter on June 14, 2023 asking that DOT not acquiesce to American Airlines and the labor unions' requests "to engage in protectionist actions that could place a JetBlue partner [JSX] at a competitive disadvantage." That letter also made no mention of SWC. Indeed, JetBlue urged DOT to resist a protectionist action "against a sole small company that cannot defend itself"—referencing not SWC but JSX: "We urge DOT to not take any steps that would harm JSX and many of the small communities that rely on its safe, secure and award-winning business model."

80.     By that point, the hijacking of SWC's application docket was complete: the letters

DCACTIVE-76208604.1

being submitted concerning the operations of JSX, an entity having no affiliation with SWC, clearly had nothing to do with the facts of SWC's application. Rather, DOT had allowed SWC's docket to serve as the forum for a de facto rulemaking campaign to clarify or amend the FAA regulatory scheme.

81.     DOT Assistant Secretary Petsonk took to responding to *ex parte* communications with a template letter saying, "Since its filing, numerous pleadings in response to SkyWest Charter's application have been submitted in the public docket. The Department is thoroughly reviewing the information in the docket."

82.     To the extent these "numerous pleadings" burdened DOT's capacity to act on SWC's application, that burden was the product of DOT's own arbitrary and unforced error of allowing what was a straightforward, uncomplicated, and routine application to be commandeered by complaints about a different agency's regulatory scheme. The fact of the matter is that the "numerous pleadings" giving DOT pause had nothing to do with the facts of SWC's application or the legal criteria applicable to DOT's determination of SWC's fitness to hold commuter air carrier authority.

## V.   DOT's Delay on SWC's Application Far Exceeds Its Usual Timeline for Processing Such Applications.

83.     On August 29, 2023—more than a year after SWC had submitted its application to DOT—FAA issued a Notice of Intent to Institute Rulemaking, published at 88 Fed. Reg. 59480 (Aug. 29, 2023). FAA proposed to address the Part 380 public charter exception to its own definition of "scheduled operations" and ancillary definitions, pointing to "public charter operations that, in light of recent high-volume operations, appear to be offered to the public as essentially indistinguishable from flights conducted by air carriers as supplemental or domestic operations under 14 CFR part 121." *Id.*

DCACTIVE-76208604.1

84.   Although not expressly stated, this regulatory action was obviously triggered by the objections raised in opposition to SWC's application.

85.   FAA's rulemaking notice further stated that the removal of the Part 380 exception from FAA's definition in 14 C.F.R. § 110.2 would "delink FAA's safety regulations from DOT's economic regulations and require operators conducting public charter flights to follow operating rules applicable to their operation based on the same criteria that apply to all other non-part 380 operators." This would also mean "some operators conducting public charter operations would need to transition from operating under part 135 to part 121." 88 Fed. Reg. at 59480.

86.   Although ALPA's objections to SWC's application, and the copycat objections that followed, never had anything to do with the propriety of SWC's application under DOT regulatory authority and criteria—inasmuch as they were effectively requesting a change to the FAA regulatory scheme, not posing any objections to SWC's application under the governing *DOT* regulations— that distraction was resolved once FAA initiated its rulemaking process: FAA's rulemaking docket indisputably became the appropriate forum to address any such issues.

87.   Yet, despite it now being (at the time of the filing of this Complaint) nearly eight months since FAA issued its rulemaking notice, and nearly two years since SWC's application was submitted, DOT has still not acted on SWC's application.

88.   This delay is unprecedented, and it is abusive and prejudicial toward SWC.

89.   DOT review of an application to provide commuter air service is fairly routine and uncomplicated for applicants clearly qualifying as U.S. citizens, as SWC is and showed itself to be in its application. For good reason, these types of applications are typically acted on within a year— usually in a matter of months, and only rarely over a year.

DCACTIVE-76208604.1

90.    For example, looking back over the last six years, excluding applications that were withdrawn or dismissed for failure to prosecute, between January 1, 2018 and March 18, 2024, DOT has acted on similarly situated applications in a timeframe ranging from 110 days to 408 days from the date of filing. Only two applicants other than SWC have not yet received final decisions; of those, SWC has waited the longest by far.

91.    In the low range of decision timelines, DOT took approximately 150 days between the filing of an application and the issuance of a final order. *See, e.g.*, Docket DOT-OST-2021-0027 (Tailwind Air, LLC: 110 days); Docket DOT-OST-2020-0050 (Reeve Air Alaska, LLC: 147 days); Docket DOT-OST-2020-0196 (Via Airlines, Inc.: 161 days); Docket DOT-OST-2022-0026 (Kenai Aviation Operations, LLC: 170 days). This includes dockets where third parties filed oppositions to the application. *See, e.g.*, DOT-OST-2020-0196-0008 (opposition of Corvus Airlines to application of Via Airlines, Inc.).

92.    In the high range, DOT took approximately 300 days, with one case taking 408 days. *See, e.g.*, Docket DOT-OST-2019-0173 (Public Charters, Inc.: 241 days);[9] Docket DOT-OST-2018-0196 (Kenmore Air Express, LLC: 288 days); Docket DOT-OST-2018-0047 (Airgate Aviation, Inc.: 307 days); Docket DOT-OST-2022-0116 (True Aviation Charter Services, LLC: 363 days); Docket DOT-OST-2021-0149 (Western Aircraft, Inc.: 408 days).

93.    Only two applications other than SWC's filed in the same timeframe have yet to be decided.

94.    First, in Docket DOT-OST-2022-0059, Air Charter Express, LLC filed an application

---

[9] For reasons not relevant here, Public Charters, Inc.'s DOT commuter authority was revoked in 2023 by Order 2023-5-1.

DCACTIVE-76208604.1

on May 17, 2022 and received three DOT requests for additional information—most recently on January 19, 2023. The last response to those requests was filed on April 25, 2023, more than 60 days after the deadline imposed by DOT's third request for additional information.

95.     Second, in Docket DOT-OST-2022-0139, USAC Airways 695 LLC d/b/a Aero Air filed an application on November 29, 2022 and received two requests for additional information—most recently on May 18, 2023. The last response to those requests was filed on May 23, 2023.

96.     Looking back a few years earlier, to applications submitted by two air carriers for commuter air carrier authority that included the operation of Part 380 public charters as part of the service proposal, it took DOT between 196 days and 307 days to issue the authority.  *See* Docket DOT-OST-2015-0208 (Delux Public Charter, LLC: 196 days); Docket DOT-OST-2013-0061 (Corporate Flight Management, Inc.: 307 days). These two commuter air carriers have operated tens of thousands of Part 380 public charter flights per year over the last several years pursuant to public charter prospectuses that were routinely accepted by DOT—and they continue to do so.

97.     By contrast, SWC's application was filed on June 21, 2022, and—as noted above—generated only one DOT request for additional information, on September 1, 2022. SWC responded to that request on September 7, 2022 and DOT confirmed the application was complete.

## VI.   SWC Has Taken Every Administrative Action Available to Obtain a Decision On Its Application.

98.     As described in the preceding paragraphs, SWC has taken every action reasonably available to it to obtain a decision from DOT on its application:

- It has reached out to DOT repeatedly by phone and email for status updates.

- It responded promptly to the only request for additional information that DOT issued.

DCACTIVE-76208604.1

- It replied promptly to third-party objections and letters filed in the public docket, even if just to clarify that those filings had nothing whatsoever to do with the fitness criteria for SWC's actual application.

- It has publicly demonstrated its commitment to adhere to a higher standard of safety than required under FAA regulations, even though that operational fact is *unrelated to the DOT economic authority* for which it has applied.

- And, most recently, on March 12, 2024, it filed a letter in the public docket highlighting DOT's undue delay in issuing a decision on its application, pointing out that all of the so-called objections to its application—which as explained are really objections to FAA's decades-old regulatory scheme—are now appropriately before FAA.

99.     Despite DOT admitting that it had already completed a draft decisional order by September 1, 2022, and that the record on SWC's application was complete as of December 2, 2022, DOT has failed—as of the date of this filing, nearly two years after SWC filed its application—to issue a decision or take other substantive action on SWC's application.

100.     Having exhausted all avenues for obtaining relief from DOT, SWC is left with no choice but to bring this suit to compel DOT to act as required by law and principles of fairness and due process.

## **CLAIMS FOR RELIEF**

### **COUNT ONE: ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 702)**

101.     SWC re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

DCACTIVE-76208604.1

102.    Defendant DOT is an agency as that term is used in the APA. *See* 5 U.S.C. § 551(1).

103.    The APA grants a right of judicial review to any person adversely affected or aggrieved by agency action, *see id.* § 702, and "agency action" includes an agency's failure to act. *See id.* § 551(13).

104.    The APA also imposes on federal agencies an obligation to "within a reasonable time . . . proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

105.    Courts are empowered by the APA to review agency action, and "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

106.    Under 14 C.F.R. § 302.210(a), DOT must take one of five actions with respect to SWC's application.

107.    DOT has had nearly two years to decide SWC's application and has taken none of the actions it is mandated by its own regulations to take on that application. Because the regulations and basic principles of administrative law (as reflected in 5 U.S.C. § 555(b)) impose a non-discretionary duty on DOT to decide SWC's application, absent any compelling circumstances justifying the delay, DOT's protracted refusal to adjudicate the application is an agency action "unlawfully withheld or unreasonably delayed" in violation of the APA. 5 U.S.C. § 706(1).

108.    DOT's nearly two-year failure to adjudicate SWC's application is indisputably unreasonable. Especially when compared to its action on other applications for commuter air carrier authorizations, DOT's delay cannot be justified. For example, the longest decision timeline within the last six years was 408 days. *See* Docket DOT-OST-2021-0149 (Western Aircraft, Inc.). That case involved as many as five requests for additional information, and DOT's tentative decision (order to show cause) to issue the requested authority was issued just 45 days after the applicant submitted its

DCACTIVE-76208604.1

last response to such a request. Here, by contrast, SWC received only one request for additional information, to which it responded within six days, and has been waiting nearly 600 days since then with no decision on its application. Unlike SWC, the only two other applications yet to be decided over the last six years had multiple DOT requests for additional information, both as recently as last year.

109.    DOT's delay has prejudiced and harmed SWC and the EAS communities and other smaller communities that have requested its service. In short, DOT's refusal to act on SWC's application for commuter authority has severely restricted SWC's ability to operate, without reasonable cause, to the detriment of SWC and small communities alike.

110.    DOT's inaction is also arbitrary and capricious in that it has clearly disadvantaged one competitor (SWC) in a manner that is inconsistent with DOT's treatment of numerous others in a group of like entities: DOT has not treated similarly situated entities similarly. *See Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (citing cases and emphasizing that "dissimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice") (citation and internal quotation marks deleted).

111.    DOT's failure to act also violates SWC's due process rights because DOT's inaction divests SWC of its statutory right to seek judicial review under the APA of DOT's decision to the extent any such decision would, on its merits, adversely affect or aggrieve SWC. DOT's failure to act on SWC's application results in constructive denial of that application while not affording SWC its concomitant right to judicial review of DOT's reasoning.

112.    The Court should, accordingly, find that DOT has unlawfully withheld or unreasonably delayed adjudication of SWC's application for commuter air carrier authorization.

DCACTIVE-76208604.1

### COUNT TWO: MANDAMUS ACTION (IN THE ALTERNATIVE)

113.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-100 as if fully set forth herein.

114.    Under 28 U.S.C. § 1361, "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." *See also Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) ("the Supreme Court has construed a claim seeking mandamus under the [Mandamus Act], 'in essence,' as one for relief under § 706 of the APA").

115.    To prevail in a mandamus action, SWC must establish that "the defendant owes [it] a clear nondiscretionary duty" and that SWC "has exhausted all other avenues of relief." *Bartlett Mem'l Med. Ctr., Inc. v. Thompson*, 347 F.3d 828, 835 (10th Cir. 2003).

116.    DOT, as noted above, owes an affirmative duty to adjudicate the applications it receives. SWC also has a right to adjudication of its application within a reasonable time. Federal law requires federal agencies to timely adjudicate the applications they receive. *See* 5 U.S.C. § 555(b). SWC has a right to a prompt adjudication of its application.

117.    Furthermore, as detailed above, SWC has made every effort to press DOT to decide its application, including reaching out repeatedly for status updates, responding to third-party filings seeking to delay or halt adjudication of its application, and, most recently, filing a letter in the public docket outlining DOT's unreasonable delay and calling for prompt action.

118.    Mandamus relief is appropriate under these circumstances.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

DCACTIVE-76208604.1

1.      Find that DOT has unlawfully withheld or unreasonably delayed a decision on SWC's application.

2.      Order, or issue a writ of mandamus compelling, DOT to complete its fitness review process and issue a final decision on SWC's application within 60 days or by an alternative deadline which the Court deems reasonable.

3.      Grant any other relief the Court deems just and proper.

DATED April 15, 2024.

                              PARR BROWN GEE & LOVELESS, PC


                              /s/ *Robert S. Clark*

                              Robert S. Clark (4015)
                              PARR BROWN GEE & LOVELESS, PC
                              101 South 200 East, Suite 700
                              Salt Lake City, Utah 84111
                              Telephone: (801) 532-7840
                              rclark@parrbrown.com

                              Daniel Wolff (Pro Hac Vice Pending)
                              CROWELL & MORING LLP
                              1001 Pennsylvania Avenue, NW
                              Washington, DC 20004
                              Telephone: (202) 624-2500
                              dwolff@crowell.com

                              Henry W. Leung (Pro Hac Vice Pending)
                              CROWELL & MORING LLP
                              3 Embarcadero Center, 26th Floor
                              San Francisco, CA 94111
                              Telephone: (415) 986-2800
                              hleung@crowell.com

                              *Attorneys for* Plaintiff *SkyWest Charter, LLC*

DCACTIVE-76208604.1